# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

IAN DANIEL KOCH,

                Plaintiff,

                                            **Case No. 14-cv-393-pp**

    v.

KAREN BUTLER, et al.,

                Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS BARB BRAUN, PATTI MANTHEY, KIM MUELLER, AND JULIE TREIBER'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 75) AND DENYING DEFENDANT KAREN BUTLER'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 71)

---

Plaintiff Ian Koch was incarcerated at the Fond du Lac County Jail during the events described in this case. On October 15, 2013, Judge William M. Conley of the U.S. District Court, Western District of Wisconsin (the judge initially assigned to the case) entered an order allowing the plaintiff to proceed on his claims that the defendants were deliberately indifferent to his medical needs in violation of the U.S. Constitution. Dkt. No. 10. On April 4, 2014, Judge Conley transferred the case from the Western District of Wisconsin to the Eastern District. Dkt. No. 25. On April 7, 2014, the Clerk's Office randomly assigned the case to Judge William C. Griesbach; on December 29, 2014, Judge Griesbach assigned the case to Judge Pepper after her appointment to the district court bench.

October 30, 2015, defendant Karen Butler, M.D., filed a motion for summary judgment, (Dkt. No. 71), and defendants Barb Braun, Patti Manthey, Kim Mueller, and Julie Treiber (nurses at the jail) filed their motion for summary judgment on November 7, 2015 (Dkt. No. 75). Those motions now are fully briefed and ready for the court's decision. The court will grant Braun, Manthey, Mueller, and Treiber's motion for summary judgment, and will deny Butler's motion for summary judgment.

## I.    FACTS[1]

The plaintiff alleges that on January 20, 2012, he injured himself while working in the jail's kitchen. Dkt. No. 83 ¶ 1. The plaintiff reported his abdominal pain to a jail nurse (not a defendant) on January 23, 2012. Dkt. No. 83 ¶ 3. The plaintiff described his pain as being on his left side, about two inches from his belly button. Dkt. No. 83 ¶ 4. The nurse suggested that the plaintiff might have a muscle strain or constipation; she told him to increase his fluid intake and exercise. Dkt. No. 83 ¶ 4. She removed the plaintiff from his job and told him to follow up with a nurse in a few days. Id.

Defendant Mueller saw the plaintiff at sick call on January 27, 2012. Dkt. No. 83 ¶ 5. Mueller recorded that the plaintiff denied any pain in his left side and said he was able to eat, sleep, and work out normally. Dkt. No. 83 ¶ 5. The plaintiff disputes this record, stating that he told Mueller his pain was still

---

[1] The court takes the facts primarily from Plaintiff Ian Koch's Response to Defendant Karen Butler, M.D.'s Proposed Statement of Facts and of Additional Facts Requiring Denial of Summary Judgment (Dkt. No. 82) and from Plaintiff Ian Koch's Response to Nursing Defendants' Proposed Finding of Fact (Dkt. No. 83). The facts are undisputed unless otherwise noted.

2

present, though it had decreased, and that he could not work out normally. Dkt. No. 83 ¶ 5.

The plaintiff next was seen on February 17, 2012. Dkt. No. 83 ¶ 6. The plaintiff states that he told Mueller that "it felt like the internal stiches from his prior hernia surgeries were ripping open." Dkt. No. 83 ¶ 6. Mueller recorded that the plaintiff reported "left lower quadrant abdominal pain and left upper quadrant abdominal pain" and that "he felt like his bowel was not emptying." Dkt. No. 83 ¶ 6. Mueller reported the information to Butler, who ordered a clear liquid diet for seventy-two hours. Dkt. No. 83 ¶ 6.

On February 20, 2012, the plaintiff complained to Braun that the liquid diet was not effective. Dkt. No. 83 ¶ 7. The plaintiff states that he tried the diet for about twenty-four hours, but felt like he was starving, so he ate some solid food once he determined the liquid diet wasn't helping. Dkt. No. 83 ¶ 7. Braun recorded the plaintiff's medical history, which included three prior hernia repairs. Dkt. No. 82 ¶ 9. The jail also requested the plaintiff's medical records from Children's Hospital. Dkt. No. 82 ¶ 9. Braun called Butler, who ordered a liquid antacid to be taken twice a day for two weeks. Dkt. No. 83 ¶ 8.

The next day, the plaintiff complained to Braun that his pain was getting worse. Dkt. No. 83 ¶ 9. The plaintiff described his pain as a seven out of ten (with ten being the worst); he explains that he could not lie down without making minimal use of the left side of his abdomen and could sit up only by rolling over and using his arms. Dkt. No. 83 ¶ 9. However, Braun recorded that, despite his complaints of significant pain, the plaintiff could "lay down

and sit up on the exam table without any guarding of his muscles and without distress." Dkt. No. 83 ¶ 9. The plaintiff agreed to take antacids as prescribed by Butler, but he states that Braun told him he could stop taking them if they did not improve his condition. Dkt. No. 83 ¶ 9. The plaintiff explains that he had surgery as a child to address problems with acid reflux, but that he had not suffered from acid reflux at any time since the surgery. Dkt. No. 82 ¶ 11. And, although he had been diagnosed as a child with being lactose intolerant, he could consume certain dairy products, such as cheese, without a problem; it was only milk that was difficult for him to consume. Dkt. No. 82 ¶ 11.

On February 23, 2012, the plaintiff complained to Braun that his pain was still a seven out of ten. Dkt. No. 83 ¶ 10. Braun recorded that the plaintiff had missed one dose of his antacid and that he had stopped exercising after hurting himself on January 20. Dkt. No. 83 ¶ 10. The plaintiff disputes this record; he states that he does not recall missing any doses of the antacid and that he told Braun that he had exercised in the weeks following his initial injury (except abdominal exercises), but that he needed to stop by February 23 because the pain was so severe. Dkt. No. 83 ¶ 10. The plaintiff also says he told Braun that his abdominal pain was shifting throughout his abdomen and had not localized in one area. Dkt. No. 83 ¶ 10. Braun again called Butler, who ordered the jail staff to keep a seventy-two hour log of the plaintiff's activities and to evaluate his urine with a dipstick test. Dkt. No. 83 ¶ 11. The log indicates that the plaintiff was exercising, playing cards, pacing, and walking up stairs quickly. Dkt. No. 82 ¶ 11.

4

Also on February 23, 2012, the plaintiff filed a grievance, in which he complained that the prescribed liquid diet and antacids had not improved his condition; he asked to go to the hospital because he believed he had a hernia. Dkt. No. 83 ¶ 13.

On March 1, 2012, Butler ordered the plaintiff be given Prilosec once a day for ninety days. Dkt. No. 83 ¶ 14. The plaintiff denies he suffered from acid reflux at any time since his surgery when he was a child. Dkt. No. 82 ¶ 12.

On March 2, 2012, the plaintiff told Mueller his pain was seven out of ten and made it hard for him to breathe. Dkt. No. 83 ¶ 15. Mueller performed a urine dipstick, which indicated there was blood in the plaintiff's urine. Dkt. No. 83 ¶ 15. After receiving this information, Butler suspected that the plaintiff might have a kidney stone, so she ordered the plaintiff to increase his fluid intake and to take Ibuprofen. Dkt. No. 83 ¶ 16. She also ordered the jail to put the plaintiff in a segregated cell with a surveillance camera to monitor his activities. Dkt. No. 83 ¶ 16.

On March 5, 2012, the plaintiff told Braun that the ibuprofen had improved his pain; it was now only a two or three out of ten. Dkt. No. 83 ¶ 17. Braun performed another urine dipstick test, which indicated a moderate amount of blood. Dkt. No. 83 ¶ 17. The next day, the plaintiff complained to Braun that his pain was back to a seven out of ten. Dkt. No. 83 ¶ 18; Dkt. No. 81-1 ¶ 16. Another urine dipstick test showed blood in the plaintiff's urine, although at a lesser amount than the prior tests. Dkt. No. 83 ¶ 18. A nurse (it is unclear which one) called Butler, who prescribed Tylenol for the plaintiff's

5

pain and asked jail administration to set up a consult with a urologist. Dkt. No. 83 ¶¶ 18, 19.

On March 7, 2012, "the jail nurse" called Fond du Lac Regional Clinic to set a urology appointment. Dkt. No. 83 ¶ 20. Appointments were being scheduled two months out, which "was too long to wait." Dkt. No. 83 ¶ 20. The nurse then called Aurora Clinic and asked for a urology appointment. Dkt. No. 83 ¶ 21. That afternoon, Aurora Clinic called back and indicated that the urologist (not a defendant) suggested that a CT scan be done before deciding whether a urology consult was necessary. Dkt. No. 83 ¶ 23. Per the Clinic, the urologist also suggested that if the plaintiff experienced increased pain, vomiting or fever, he could be taken to the emergency room. Dkt. No. 83 ¶ 23.

According to the plaintiff, he told a correctional officer (not a defendant) at about 4:00 p.m. on March 7, 2012, that he had to go to the hospital because it felt "like his stomach lining was ripping." Dkt. No. 83 ¶ 24. The officer called Butler, who ordered a clear liquid diet and instructed the officer to have the plaintiff see a nurse in the morning. Dkt. No. 83 ¶ 24. Butler does not have access to medical records when she talks about patients over the phone, and she acknowledges that she did not consult the plaintiff's medical records before ordering this course of treatment. Dkt. No. 86 ¶ 4; Dkt. No. 82 ¶ 16.

At about 6:15 p.m., a correctional officer observed the plaintiff lying on his cell floor in the fetal position. Dkt. No. 83 ¶ 25. The plaintiff states that he again told the officer it was painful to breathe and that the pain was in his

Case 1:14-cv-00393-PP   Filed 06/07/16   Page 6 of 21   Document 90

right side. Dkt. No. 83 ¶ 25. The officer notified Butler of the plaintiff's vitals and complaints; she did not change her orders. Dkt. No. 83 ¶ 25.

By 10 p.m. that night, the plaintiff states that there was vomit all over his cell. Dkt. No. 83 ¶ 26. The plaintiff explains that initially he had been able to make it to the toilet, but as the pain increased, he began to vomit in a cup and then on the floor, off the side of his bed. Dkt. No. 83 ¶ 26. The officer's record—which the plaintiff argues minimizes the circumstances—notes that the plaintiff was complaining of vomiting and that the officer observed some clear liquid on the floor, which might have been vomit. Dkt. No. 83 ¶ 26. The officer called Butler, who continued her order that the plaintiff be kept on a clear liquid diet, see the nurse in the morning and remain in an observation cell; she also prescribed Vistaril (for anxiety) and Clonidine. Dkt. No. 83 ¶ 27; Dkt. No. 82 ¶ 16.

Butler's practice is to visit the Fond du Lac County Jail once per week, usually on Thursdays. Dkt. No. 83 ¶ 28. March 8, 2012 happened to be a Thursday, so Butler came to the institution to review charts and see patients. Dkt. No. 83 ¶ 28. At 7:05 a.m., Butler reviewed the plaintiff's chart. Dkt. No. 82 ¶ 17. According to Butler, this was the first she learned of the urologist's suggestion that the plaintiff be sent to the hospital if his symptoms worsened. Dkt. No. 82 ¶ 16. Butler noted that the activity log, maintained by correctional officers from 4 p.m. until 1:30 a.m. on the night of March 7-8, indicated that the plaintiff had been sleeping without incident and sitting quietly or standing. Dkt. No. 82 ¶ 17. Butler decided to order a CT scan based on the plaintiff's

7

"hernaturia, [increased] pain, and vomiting." Dkt. No. 83 ¶ 28; Dkt. No. 82 ¶ 17. She also ordered that the plaintiff continue a clear liquid diet for another seventy-two hours, continue to be monitored in a camera cell, and take the Prilosec. Dkt. No. 82 ¶ 17. Jail staff scheduled the CT scan for the next afternoon—March 9, 2012, at 2:30 p.m. Dkt. No. 82 ¶ 17. Butler did not see the plaintiff in person. Dkt. No. 86 ¶ 5.

On March 8, 2012, at 9:20 a.m., the plaintiff told Treiber during sick call that he had vomited fifteen times between 4 p.m. on March 7 and 1 a.m. on March 8. Dkt. No. 83 ¶ 29. He said the vomit started out brown, turned clear, and finally was tinged red. Dkt. No. 83 ¶ 29. The plaintiff states that he told Treiber that the pain he was feeling was different than the abdominal injury he experienced on January 20. Dkt. No. 83 ¶ 29. He claims he told her that the pain had moved to his right side starting the day before, and that it was the worst pain he had ever experienced in his life. Dkt. No. 83 ¶ 29. He also said that, while the pain had been 3500 on a scale of ten the night before, it was now at a two out of ten. Dkt. No. 83 ¶ 30. The plaintiff states that he requested to be returned to the general population because he had not liked being isolated while he was suffering, and he asked for new clothes and shoes because his clothes were stained with vomit. Dkt. No. 83 ¶ 30. Treiber did not schedule the plaintiff to see Butler. Dkt. No. 83 ¶ 30.

On March 9, 2012, at 2:30 p.m., the plaintiff underwent a CT scan. Dkt. No. 83 ¶ 31. The radiologist read the CT as showing an enlarged appendix. Dkt. No. 83 ¶ 32. Butler learned of the results at 3:10 p.m. and immediately ordered

that the plaintiff be taken by ambulance to the hospital, where he had surgery to remove his appendix. Dkt. No. 83 ¶ 32; Dkt. No. 82 ¶ 18. The appendix was enlarged but it was intact; it had not burst. Dkt. No. 83 ¶ 32.

The doctor who removed the plaintiff's appendix recorded that the plaintiff had been experiencing left lower quadrant pain for about two months and that the pain had become localized more toward the right and was associated with nausea, vomiting, and "poor p.o. intake." Dkt. No. 82 ¶ 20. The doctor noted, "This pain is more severe and different from what he is experiencing over the last 2 months in the left lower quadrant. He denies any similar problems in the past." Dkt. No. 82 ¶ 21. The plaintiff states that he spoke with the doctor only about his then current pain, not about the pain he had been experiencing on his left side for the prior two months. Dkt. No. 82 ¶¶ 21, 22.

On March 12, 2012, at sick call, the plaintiff states that he complained to Braun that he continued to have pain on his left side, which was the same pain he experienced in January. Dkt. No. 83 ¶ 33. The plaintiff also states that he complained about pain where his surgical incisions were; he had Steri strips covering the incisions in three places. Dkt. No. 83 ¶ 33. The plaintiff states that Braun began to remove one of the strips, which caused "incredible pain." Dkt. No. 83 ¶ 33. The plaintiff also states that Butler ordered his pain relief medication to be cut in half, which contributed to the plaintiff's continued abdominal pain post-surgery. Dkt. No. 83 ¶ 33.

9

The plaintiff continued to complain of pain in his left side and at the incision site through May 2, 2012. Dkt. No. 83 ¶¶ 34-37.

## II.   DISCUSSION

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    Deliberate Indifference Standard

A pretrial detainee's claim that officials were deliberately indifferent to his serious medical needs arises under the Due Process Clause of the Fourteenth Amendment. Chavez v. Cady, 207 F.3d 901, 904 (7th Cir. 2000). Courts generally analyze such claims, however, the same way they analyze deliberate indifference claims under the Eighth Amendment. Id. at 904 (citations omitted). The plaintiff must demonstrate both an objective element (i.e., that the plaintiff's medical need be sufficiently serious) and a subjective element (i.e., that the officials act with a sufficiently culpable state of mind). Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997).

The court finds that appendicitis is a sufficiently serious medical need, so it will focus its analysis on the subjective element—whether the defendants were deliberately indifferent. With regard to the subjective element, a plaintiff must show that the defendants had "*actual* knowledge" that the plaintiff was "at risk of serious harm." Pittman ex rel. Hamilton v. Cnty. of Madison, Ill., 746 F.3d 766, 778 (7th Cir. 2014) (emphasis in original). In addition, he must show that, despite having knowledge of such a risk, the defendants failed to take reasonable measures to abate the risk. Farmer v. Brennan, 511 U.S. 825, 847 (1994). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844. Medical

11

malpractice does not constitute deliberate indifference. <u>Duckworth v. Ahmad</u>, 532 F.3d 675, 679 (7th Cir. 2008). (Citation omitted). It "means more than negligent," but is "something less than purposeful." <u>Id.</u> (citing <u>Farmer</u>, 511 U.S. at 836).

C.    <u>Applying the Law to the Facts</u>

The parties agree that the defendants did *something* to treat the plaintiff's medical needs; the dispute is whether they did *enough*. The defendants argue that the plaintiff's symptoms were shifting and that the plaintiff refused to follow prescribed treatments, making it difficult to assess what was wrong with him and how to treat it. They assert that they did the best they could given the circumstances, and argue that based on the record before the court, no fact finder could determine they were deliberately indifferent to the plaintiff's medical needs.

The plaintiff argues that the defendants ignored his consistent complaints and failed to properly investigate his symptoms. He claims that as a result of their indifference to his needs, they failed to diagnose his appendicitis, and he was forced to suffer additional pain that he could have been spared.

1.    <u>January 23, 2012, through March 6, 2012</u>

The court agrees with the defendants that no fact finder could determine that, through March 6, 2012, the defendants had been deliberately indifferent to the plaintiff's serious medical needs. The plaintiff complained of an injury on January 23, 2012; however, the pain associated with that injury had significantly improved, if not resolved, by January 27, 2012. The plaintiff did

12

not seek any medical care for an additional twenty-two days. Given his persistence in trying to obtain care throughout the latter half of February and early March, the reasonable inference is that the rest and increase in fluid intake suggested by the nurse adequately addressed the plaintiff's initial needs.

From February 17 through March 6, the plaintiff once again complained of stomach pain, consistently rating it during this period as a seven out of ten. The nurses recorded the pain as being located in the lower left side of his abdomen, but the plaintiff states that he told them the pain was shifting throughout his abdomen and had not settled in one location. Regardless, the record reveals the defendants made consistent attempts to both address and diagnose the plaintiff's pain.

The nurses conducted physical exams and reported their observations to the doctor on multiple occasions. For about a week, Butler attempted to resolve the plaintiff's pain with changes to his diet and medication. She ordered a clear liquid diet (which the plaintiff tried for a period of time, then rejected as ineffective); she prescribed antacids and Prilosec; and she ordered the kitchen to implement diet restrictions. When those changes proved ineffective, she began to look for other causes of the pain.

On February 23, 2012, Butler ordered a urine dipstick and a seventy-two hour activity log. After the dipstick revealed blood in the plaintiff's urine, she ordered that he be placed in a camera cell for observation. Suspecting the plaintiff might have a kidney stone, she ordered him to increase his fluid intake to help him pass the stone and prescribed Ibuprofen to reduce his pain. This

13

treatment plan temporarily improved the plaintiff's pain level, which decreased to a two on a scale of ten.

Over the next week, Butler ordered two more dipsticks, both of which revealed the presence of blood, although less than the first dipstick. On March 6, 2012, Butler ordered Tylenol and referred the plaintiff to a urologist so that he could undergo a CT scan, to better understand why the plaintiff's urine contained blood.

Up to this point, Butler (and the nurses via Butler's orders) provided continuous care, assessment and monitoring in response to the plaintiff's complaints. Butler considered his history, symptoms and test results, and, when conservative treatments proved to be ineffective, she referred the plaintiff to an outside specialist. The plaintiff may think she got it all wrong, but the plaintiff's disagreement with the kind of treatment he received is not sufficient to overcome summary judgment. See Stallings v. Liping Zhang, 607 Fed. App'x 591, 593 (7th Cir. 2015). As the court noted above, deliberate indifference is not medical malpractice (even if such malpractice occurred). Duckworth, 532 F.3d at 679. To survive summary judgment, the plaintiff must present evidence that the defendants' choices were so "significant a departure from accepted professional standards or practices" that it is questionable whether they actually exercised professional judgment. Id. (citing Pyles v. Fahim, 771 F.3d 403 at 409 (7th Cir. 2014)).

The plaintiff's expert has opined that the plaintiff may have been suffering from appendicitis as early as February 23, 2012. Dkt. No. 82 ¶ 28.

14

Even he agrees, however, that the plaintiff's symptoms through March 6, 2012, did not correlate with the typical presentation of appendicitis. Dkt. No. 82 ¶ 31. Specifically, the plaintiff's expert stated that the symptoms of appendicitis may include abdominal pain on the *right* side (up to this point, all of the plaintiff's complaints referred to shifting pain and/or pain on his *left* side), fever, vomiting, anorexia, blood pressure changes, anxiety and sweating. Dkt. No. 82 ¶ 25. The plaintiff was exhibiting none of these symptoms. In fact, the symptom that spurred Butler to refer the plaintiff to a specialist (i.e., blood in his urine) is *not* associated with appendicitis. Dkt. No. 82 ¶ 35. The plaintiff's expert acknowledges that *that* symptom is consistent with having a kidney stone, which is precisely what Butler eventually suspected and began to treat the plaintiff for (e.g., by ordering that he significantly increase his fluid intake).

The plaintiff has presented nothing to show that the defendants' course of treatment from January 23, 2012, through March 6, 2012—including dietary changes, medications, observation, urine dipsticks and referral to a specialist—significantly departed from accepted professional standards.

Defendants Braun, Manthey and Mueller had no contact with the plaintiff outside of that timeframe (see Dkt. No. 81-1 ¶¶ 7-10, 11, 12, 14-16; Dkt. No. 83 ¶¶ 6, 63). Because the plaintiff has not provided evidence raising a genuine dispute of material fact regarding these three defendants, and has not produced evidence demonstrating that these three defendants were deliberately indifferent to the plaintiff's serious medical needs, the court dismisses them from this action.

15

The court will move on to consider those defendants who had continued contact with the plaintiff after March 6, 2012.

    1.  <u>March 7, 2012 through March 9, 2012</u>

On March 7, 2012, the plaintiff's symptoms changed significantly. At about 4:00 p.m., the plaintiff notified a correctional officer that he was in severe pain. Butler was notified, and she ordered a clear liquid diet and placed the plaintiff in an observation cell. Two hours later, staff found the plaintiff curled up on the floor in a fetal position; he told a correctional officer that he couldn't breathe because of the pain and that the pain was in his *right* side. The officers notified Butler. At 10:00 p.m., the plaintiff notified the officers that he was vomiting. Again, the officers notified Butler. She prescribed a medication for anxiety as well as other medications (it's unclear what suspected conditions she intended to treat with those medications).

The next morning, Butler happened to be in the plaintiff's institution to see patients and review files. She reviewed the plaintiff's file first thing in the morning, at about 7 a.m. Despite having been called about the plaintiff's condition three times the night before, and despite a progression (if not a definitive change) in the plaintiff's symptoms, she decided not to see the plaintiff.

Butler states that she looked at the activity log completed by the officers. The log allows an observer to place a hash mark in eight different columns: Acting Out; Sitting Quietly or Standing; Sleeping Visualize Breathing; Using Bathroom; Talking to Others; Laughing or Crying; Self Stimulating; and Other

16

Explain. Id. According to the log, an officer checked in on the plaintiff once an hour. Id. The log indicated that the plaintiff had been sitting, standing, sleeping or talking to officers from 4:00 p.m. through 1:30 a.m. Dkt. No. 82 ¶ 17. Butler decided that the activity log was "contrary to [the plaintiff's] subjective complaints from the night previous." Id.

The indications in the log—that the plaintiff either was sitting, standing, sleeping, or talking to officers—are vague. For example, on several occasions, the log indicates that the plaintiff was observed talking to an officer, but the notations do not reflect the subjects of the conversations, or the plaintiff's behavior while he was talking to the officers. The plaintiff states that he complained to the officers several times about the severe pain he was experiencing, and Butler acknowledges that she received three calls to that effect. The log's indications that the plaintiff was "talking to officers" confirms that the plaintiff had contact with officers during the night; they do not provide any evidence to support or dispute the plaintiff's claims that those conversations related to his pain. Yet Butler concluded that the log contradicted the plaintiff's complaints.

Similarly, while the log contains notations that at various times during the night, the plaintiff was "sitting quietly or standing," "laying on back," "laying on back awake," "on back," or "left side," it contains no further detail about his behavior while in these positions. As recounted above, at about 6:15 p.m. on March 7, a correctional officer observed the plaintiff lying on his cell floor in the fetal position. Dkt. No. 83 ¶ 25. Someone lying on the floor in a fetal

position is lying "on side;" those two words, however, do not paint the full picture. A person sleeping peacefully may be lying on his side; a person in severe pain may be lying on his side, but the similarities end with the description of the orientation of the person's body in space.

While there is an "other column" in the log, there is no space to write anything meaningful, which discourages observers from including important details that would explain or qualify whatever hash marks they make. Nowhere does the log indicate that the plaintiff had thrown up, yet an officer separately reported to Butler that he had seen liquid in the plaintiff's cell that could have been vomit. And, with observations being recorded only once an hour, there also exists the possibility that any guard checking on him might not have observed the plaintiff while he was vomiting.

It appears that, rather than following up on the fact that the log did not comport with the plaintiff's complaints to her, Butler simply construed the log as discounting everything the plaintiff had told her the night before. She did not review the video coverage from the camera in his cell (despite the fact that she'd ordered him to be put in a camera cell). She did not follow up with the officers who made remarks in the log, to ask whether the plaintiff appeared in distress when he was talking with officers, or appeared in distress when he was lying down.

In light of the shift and/or progression in the plaintiff's symptoms and the fact that Butler was on site at the institution the very morning after those symptoms presented, there is a genuine dispute over a material fact: whether

Butler failed to take reasonable measures to abate the risk to the plaintiff when she decided not to send him to the emergency room for an in-person evaluation on the night of March 7, 2012, and/or see the plaintiff in person on the morning of March 8, 2012. See Dkt. 80 at 21 (Dr. Holmburg opining that, "Once Koch began vomiting and experiencing extreme pain on March 7, it was at a minimum recklessly indifferent for Dr. Butler to refuse to immediately check on Koch or send him to the emergency room for an evaluation.") For this reason, the court will deny Butler's summary judgment motion.

This leaves Treiber, the nurse who evaluated the plaintiff at about 9:20 a.m. on March 8, 2012. The plaintiff told Treiber that he had experienced the worst pain of his life the night before (a 3500 on a scale of ten), and that he had thrown up fifteen times. He also told her, however, that at the time he met with her, his pain currently was at a two, that he wanted new clothes and shoes, that he wanted to be put back on his regular diet, and that he wanted to go back to the general population. Treiber reported this information to Butler. Dkt. No. 83 ¶ 30.

There is some dispute regarding whether the nurses were to recommend to Butler which patients she should see or whether Butler determined on her own which patients to see, but there is no dispute that Butler was at the prison on March 8, 2012, and that by the time Treiber saw the plaintiff at 9:20 a.m., Butler already had reviewed the plaintiff's records some two hours before, and decided not to see the plaintiff in person. It is not clear from the record whether Treiber knew that Butler already had seen the plaintiff. What is clear is that

19

the plaintiff himself told Treiber his pain was a manageable two out of ten, and that he himself requested that he be allowed to go back to general population, in clean clothes.

The plaintiff argues that Treiber could have sent him to the emergency room. Even accepting the plaintiff's facts as true, however, what he told Treiber did not indicate that an emergency situation existed. The plaintiff told Treiber that his pain was largely diminished, he was no longer vomiting, he wanted to eat regular food, and he wanted to go back to the general population. In other words, while there may have been an emergency situation the previous night, according to the plaintiff himself, it was no longer an emergency by the time Treiber could do anything about it.

Because there is no genuine dispute of material fact about whether Treiber was presented with an emergency situation, the court cannot find as a matter of law that Treiber was deliberately indifferent to the plaintiff's serious medical need. The court will dismisses Trieber as a defendant.

### III.  CONCLUSION

The court **ORDERS** that defendants Barb Braun, Patti Manthey, Kim Mueller, and Julie Treiber's motion for summary judgment (Dkt. No. 75) is **GRANTED**. The court **DISMISSES** Barb Braun, Patti Manthey, Kim Mueller, and Julie Treiber from this lawsuit.

The court further **ORDERS** that defendant Karen Butler's motion for summary judgment (Dkt. No. 71) is **DENIED**. The court will schedule a conference to discuss trial dates.

Dated in Milwaukee, Wisconsin this 7th day of June, 2016.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge